IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:12cr84-MHT |
| | ) | (WO) |
| COURTNEY JOHNSON | ) | |

OPINION AND ORDER

Courtney Johnson is a defendant with an
intellectual disability, who came before this court for
violating his probation by failing to complete a
drug-treatment program.  The central dispute between
the parties was whether he should receive custody or
whether continuing drug treatment was a more reasonable
sentence.

Years ago, we would not have had this discussion,
because Courtney Johnson would have been put in a
mental-health facility and would not have received any
treatment at all.  He would have just been housed away
as someone who is perhaps 'mentally retarded,'

forgotten and potentially abused.  We no longer do that.

And yet, Johnson was still before this court, with the potential of being locked up.  The court refused to sentence Johnson to custody, reasoning that we should not take people with intellectual disabilities out of mental-health facilities simply to put them in prison instead.  We cannot just substitute one institution for another.  This opinion explains how we, as a country, have moved people with intellectual disabilities from one institution to another and why the court refused to continue that pattern in this case.

## I. BACKGROUND

Johnson is a 24 year-old man who was born and raised in Montgomery, Alabama.  He is the youngest of his mother's seven children, and he continues to live with his mother in Montgomery.  He has no relationship with his father.  Johnson testified that he did not have many friends and relied on family for support.

2

Although Johnson had a relatively stable home life with his mother and siblings, he grew up with violence around him. Drug dealing and shootings were common in the neighborhood. Three of his cousins have been killed by violence. His older brother, whom Johnson described as the backbone of the family, also passed away four years ago, from natural causes. Despite the hardship, Johnson never became involved in the violence himself; however, he did begin to use marijuana daily at age 16.

Johnson struggled in school. He was held back in the second, fifth, sixth, and ninth grades. Although he had failed a number of grades, the school did not recognize his intellectual disabilities until seventh grade, at which point he received one year of instruction tailored to his needs. He did not receive this tailored instruction, or any other additional help, before or after seventh grade. After ninth

grade, Johnson "aged out" of high school.  He was 18
years old at the time.[1]

Soon after Johnson "aged out" of school, he was
recruited by his aunt and cousins to take part in a tax
scheme they had started at least one year earlier, in
2008.  His aunt owned a tax-preparation business and
used the business to file false returns.  The aunt
sought out certain members of the family to whose bank
account she could route the fraudulent returns,
presumably in an attempt to mask the source of the

---

1.  Although there is not a full record on
Johnson's education, the school's seeming failure to
recognize his disability until he was at a relatively
late stage and the single year of tailored instruction
after that recognition raise questions under the
Individuals with Disabilities Education Act (IDEA), 20
U.S.C. § 1400 et seq.  That act requires that "all
children with disabilities ... who are in need of
special education and related services, are identified,
located, and evaluated and a practical method is
developed and implemented to determine which children
with disabilities are currently receiving needed
special education and services."    20 U.S.C.
§ 1412(a)(3).  Based on the available record, it is
unclear why it took the school until seventh grade to
identify Johnson's intellectual disability or why his
individualized education plan (if he had one) called
for only one year of tailored education.

returns.    After  being  recruited  by  his  aunt  and cousins, Johnson agreed to allow some of the money into his bank account.    The  scheme  was  discovered,  Johnson was  charged,  and  he  pled  guilty  to  conspiracy  to defraud the United States, pursuant to 18 U.S.C. § 371. After  taking  into  account  Johnson's  limited participation  in  the  scheme,  his  young  age,  his addiction  to  marijuana,  and  his  susceptibility  to influence  by  family  because  of  his  intellectual disability,  the  court  sentenced  Johnson  to  five  years of  probation  in  October  2012.    He  started  probation  in February 2013.

After  ten  months  of  probation  without  a  violation, Johnson  tested  positive  twice  for  drugs  towards  the  end of  the  first  year  (October  and  December  2013).    Before the  revocation  hearing  on  these  violations,  he  had  a psychological  evaluation  by  Dr.  Catherine  Boyer,  a clinical  and  forensic  psychologist.    Boyer  found  that Johnson  has  a  full  scale  IQ  of  72,  which  puts  him  at the  bottom  end  of  the  range  for  borderline  intellectual

functioning and close to the 70 cutoff for mild mental retardation.   He is below the fifth percentile in working memory, processing speed, and verbal comprehension, and he has the receptive vocabulary of a 10 year old.   He testified, and probation confirmed, that he has trouble with basic reading and writing. While he can add money, he has difficulty with addition and subtraction, which has prevented him from being able to complete job applications in the past, such as one to Subway.   His strength is perceptual reasoning and visual spatial abilities, where he is in the twenty-first percentile.

Taking into account the difficulty of fighting drug addiction and Johnson's intellectual disability, the court ordered Johnson to complete five months at an inpatient halfway house. On his first day at this halfway house (April 2014), he tested positive for

6

"spice" and was not able to attend at all.[2]  He also tested positive for spice several months later (June 2014), when he was arrested for a crime that was eventually nol-prossed.  Upon consideration of a second revocation petition due to these violations, the court ordered Johnson to spend six months in a different inpatient treatment center, which he began in October 2014.  He completed five months and three weeks before being removed for smoking a cigarette in the bathroom as well as for losing his job and being in possession of an unidentified liquid outside of the cafeteria. Johnson pled guilt to smoking a cigarette in the bathroom and being removed from the inpatient facility for that reason.  The court accepted his guilty plea, on those grounds alone.  Although Johnson tested negative for drugs several days after being removed,

---

2.  Spice is a form of synthetic marijuana. Its widespread use in Alabama has been deemed a public health crisis.  See Michael E. Miller, Inside Alabama's Deadly Spice Craze, Wash. Post, http://www.washingtonpost.com/news/morning-mix/wp/2015/04/24/inside-alabamas-deadly-spice-craze/.

and presumably stayed clean in the halfway house, he has since admitted to using spice in the two months since being out of the inpatient facility (around May 2015). He has not tested positive for any drug except marijuana and spice.

Although Johnson has relapsed several times on his spice addiction, he has maintained relatively steady employment. From 2010 to 2012, he worked at a recycling firm as a laborer and a forklift driver at least part time. In the fall of 2012, he obtained a job at a Hyundai supplier, where he again worked as a laborer. While Johnson's job history from 2013 to 2014 is unclear, he started another job at Big Lots when he enrolled at the second halfway house in October 2014. After working that job for several months, he spent three to four months at a food-processing plant, where he suffered an on-the-job injury. He could not work for several weeks due to the injury, but he subsequently found another job at a Hyundai supplier and now works on call delivering packages for a

relative who is a FedEx contractor.   While many of these were temporary jobs, Johnson has demonstrated continual effort to obtain employment and has done so despite his intellectual disability.

Johnson was before the court to determine whether it should revoke his probation or modify its conditions.


## II. SENTENCING GUIDELINES

When a defendant violates probation, a court may either "continue him on probation, with or without extending the term or modifying or enlarging the conditions; ... or revoke the sentence of probation and resentence the defendant...." 18 U.S.C. § 3565.[3]   In

_____

3. Probation did not note drug use on the violation report, and the court therefore did not consider it as a ground for revocation. Even if the drug use were considered, it would still not warrant a custody sentence.

Revocation is "mandatory" for certain violations, including if the defendant, "as a part of drug testing, tests positive for illegal controlled substances more (continued...)

making its decision, the district court must determine

what is a reasonable sentence by applying the

sentencing factors listed in 18 U.S.C. § 3553(a):

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> "(2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational

---

than 3 times over the course of 1 year."  18 U.S.C. § 3565(b).  However, in the case of failed drug tests, "the court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception" to revocation.  18 U.S.C. § 3563(e).  Here, Johnson did test positive more than 3 times in one year--in October 2013, December 2013, April 2014, and June 2014.  Nevertheless, for the reasons stated in this opinion, an exception is warranted based on Johnson's need for drug treatment.

training, medical care, or other
correctional treatment in the most
effective manner;

"(3) the kinds of sentences available;

"(4) the kinds of sentence and the
sentencing range established for—

(A) the applicable category of offense
committed by the applicable category
of defendant as set forth in the
[sentencing] guidelines ...

"(5) any pertinent policy statement
[by the Sentencing Commission] ...

"(6) the need to avoid unwarranted
sentence disparities among defendants
with similar records who have been
found guilty of similar conduct; and

"(7) the need to provide restitution
to any victims of the offense."

To aid the court in determining a reasonable
sentence, the United States Sentencing Guidelines
provide potential sentencing ranges should the court
revoke probation. See USSG § ch.7, pt. A. These
ranges are advisory policy statements and are not
binding; however, courts must at least consider them
when imposing a sentence. See id.

11

The policy statements on revocation are based on the seriousness of the violation and the defendant's prior criminal history at the time he was originally sentenced.

Johnson's failure to complete all six months at the inpatient facility is a class C violation.  Class C violations are the least serious violations and include conduct constituting a federal, state, or local offense punishable by one year or less, or any violation of any condition of probation.  See USSG § 7B1.1.  The failure to stay at the halfway house was a violation of probation conditions.  When Johnson committed his original crime, he had no criminal history, which puts him in criminal history category I.  The range of imprisonment is 3 to 9 months for a Grade C violation by an offender with a criminal history category of I.  See USSG § 7B1.4.

12

### III. DISCUSSION

Johnson played a minor role in a non-violent crime when he was 18 years old, soon after he "aged out" of a school that provided him one year of special education despite his intellectual disability.  He continues to be part of the criminal justice system based on repeated positive drug tests on probation.  As stated, the issue raised by the parties was whether Johnson should receive custody for his probation violation.


### A.

To understand the reason why Johnson became part of and remains within the criminal justice system, it is important to understand the historical context of how courts have treated individuals with intellectual disabilities in the past.

The court system--and this country--have struggled with how best to support individuals with intellectual disabilities.  Before the 1970s and 1980s, people with intellectual disabilities were routinely committed

13

involuntarily to state institutions.  <u>See</u> Gunnar Dybwad & Stanley S. Herr, <u>Unnecessary Coercion: An End to Involuntary Civil Commitment of Retarded Persons</u>, 31 Stan. L. Rev. 753, 754 (1979).  This solution, likely born out of the pseudo-science of eugenics, <u>see</u> <u>id</u>.; James W. Ellis Ruth A., <u>Mentally Retarded Criminal Defendants</u>, 53 Geo. Wash. L. Rev. 414, 419 (1985), saw intellectual disability as a "hopeless and incurable static condition," that could not be affected by an individual's "learning and living environments," Stanley S. Herr, <u>The New Clients: Legal Services for Mentally Retarded Persons</u>, 31 Stan. L. Rev. 553, 561 (1979) (internal quotation marks omitted).  "Since retarded people[4] were seen as 'going nowhere,' lawmakers

---

   4.  Throughout the opinion, the court uses "people first" language and will generally use intellectual disability rather than mental retardation.  <u>See</u> Joan Petersilia, California Policy Research Center, University of California, <u>Doing Justice? Criminal Offenders with Developmental Disabilities</u>, 1 n.1 (2000) (noting that "people first" language refers to the "person first, rather than the disability" and that "although the term mental retardation is still used, (continued...)

and caretakers had little incentive to fund or operate

adequate training programs." Id.

   This court has experience with the consequences of

that view.   In Wyatt v. Stickey, Judge Frank M.

Johnson, Jr. described the unconstitutional conditions

at an Alabama institution for individuals with

intellectual disabilities:

> "The evidence ... has vividly and
> undisputedly portrayed Partlow State
> School and Hospital as a warehousing
> institution which, because of its
> atmosphere of psychological and
> physical deprivation, is wholly
> incapable of furnishing habilitation
> to the mentally retarded and is
> conducive only to the deterioration
> and the debilitation of the
> residents.[5]   The evidence has

_____

the preferred term is cognitive, intellectual, or
developmental disability"); see also Diagnostic and
Statistical Manual of Mental Disorders 33-41 (5th ed.
2013) (using intellectual disability).   However, the
court will not alter quotations to do so.

   5.   The court's opinion defined habilitation as
"the process by which the staff of the institution
assists the resident to acquire and maintain those life
skills which enable him to cope more effectively with
the demands of his own person and of his environment
and to raise the level of his physical, mental, and
(continued...)

> reflected further that safety and
> sanitary conditions at Partlow are
> substandard to the point of
> endangering the health and lives of
> those residing there, that the wards
> are grossly understaffed, rendering
> even simple custodial care impossible,
> and that overcrowding remains a
> dangerous problem often leading to
> serious accidents, some of which have
> resulted in deaths of residents."

344 F. Supp. 387, 391 (M.D. Ala. 1972) (Johnson, J.)

(internal quotation marks omitted) aff'd in part, rev'd

in part and remanded sub nom. Wyatt v. Aderholt, 503

F.2d 1305 (5th Cir. 1974).   In a later law review

article, Judge Johnson continued,

> "Indeed, the evidence reflected that
> one resident was scalded to death when
> a fellow resident hosed water from one
> of the bath facilities on him; another
> died as a result of the insertion of a
> running water hose into his rectum by
> a working resident who was cleaning
> him; one died when soapy water was
> forced into his mouth; another died of

social efficiency. Habilitation includes but is not
limited to programs of formal, structured education and
treatment." Wyatt v. Stickney, 344 F. Supp. 387, 395
(M.D. Ala. 1972) aff'd in part, rev'd in part and
remanded sub nom. Wyatt v. Aderholt, 503 F.2d 1305 (5th
Cir. 1974).

16

> a self-administered overdose of
> inadequately stored drugs; and
> authorities restrained another
> resident in a straitjacket for <u>nine
> years</u> to prevent him from sucking his
> hands and fingers. Witnesses
> described the Partlow facilities as
> barbaric and primitive; some residents
> had no place to sit to eat meals, and
> coffee cans served as toilets in some
> areas of the institution."

Frank M. Johnson, <u>The Constitution and the Federal
District Judge</u>, 54 Tex. L. Rev. 903, 909 (1976)
(emphasis in original).

While the <u>Wyatt</u> lawsuit and those like it
ameliorated conditions in these institutions, <u>id</u>. at
909-910, advocates maintained that "involuntary
commitment by its very nature imposes a grave and
irreversible stigma on both retarded persons and their
families." Dybwad and Herr, <u>supra</u>, at 756. The gist
of this deinstitutionalization argument is that
ameliorating institutional conditions attacks a
by-product of segregation of individuals with
intellectual disabilities but does not address the
ideology of segregation itself. Segregation signals

17

that those with intellectual disabilities are hopeless, unworthy of family, and pose a threat or burden the community cannot bear.  In other words, segregation suggests that individuals with intellectual disabilities are not full human beings.  And, when individuals are not thought of as human beings, dehumanizing conditions such as those in <u>Wyatt</u> probably will reoccur, despite the best efforts of courts and those who manage the institutions.

Responding to these arguments, the World Health Organization, United Nations, and American Association on Mental Deficiency all endorsed the position that individuals with intellectual disabilities live in the least restrictive environment by 1980.  Herr, <u>supra</u>, at 558-559.  In the late 1990s, the Supreme Court recognized that Congress came to the same conclusion in the Americans with Disabilities Act.  The Court stated,

> "Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments.  First, institutional

> placement of persons who can handle
> and benefit from community settings
> perpetuates unwarranted assumptions
> that persons so isolated are incapable
> or unworthy of participating in
> community life. Second, confinement
> in an institution severely diminishes
> the everyday life activities of
> individuals, including family
> relations, social contacts, work
> options, economic independence,
> educational advancement, and cultural
> enrichment."

<u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 601-602
(1999) (internal citations omitted).[6]

The success of the deinstitutionalization movement
has brought its own challenges with the criminal
justice system and addiction that intersect in this
case. Since deinstitutionalization, scholars have
predicted an increased number of individuals with
intellectual disability interacting with the criminal
justice system for several reasons.

---

6. The term 'mental disabilities,' which the Court
used, can refer to individuals with intellectual
disabilities as well as those with mental illness.
While the needs of individuals with these disabilities
differ, Congress determined that it was discrimination
for either to be segregated without justification.

First, deinstitutionalization rightly allows people with intellectual disabilities to be part of their community, but a small subset of this group, just like anyone else in the community, may commit crimes.  <u>See</u> H. Rutherford Turnbell III, <u>The Mental Retardation Services System</u> <u>in</u> <u>The Criminal Justice System and Mental Retardation</u> 4, 4-5 (Ronald W. Corley et al., eds., 1992) ("None of us should say that people with mental retardation do not commit crimes.").  Of course, people who commit crimes interact with the criminal justice system.

Second, people with intellectual disabilities often have "a susceptibility to being involved in criminal activity by others who exploit their naiveté."  Diane Courselle, Mark Watt, Donna Sheen, <u>Suspects, Defendants, and Offenders with Mental Retardation in Wyoming</u>, 1 Wyo. L. Rev. 1, 5 (2001); <u>see also</u> Joan Petersilia, California Policy Research Center, University of California, <u>Doing Justice? Criminal Offenders with Developmental Disabilities</u>, 10 (2000)

(In relation to her study on California prisons, noting that "[w]ith the growth of gangs in urban areas, there appears to be a greater incidence of exploitation of people with mental retardation in criminal activities").   As examples of this susceptibility, people with intellectual disabilities "may act as lookouts, transport drugs or other contraband, carry a forged check into a bank, or attempt to sell merchandise stolen by others" at another's request. President's Committee on Mental Retardation, <u>Report to the President: Citizens with Mental Retardation and the Criminal Justice System</u> 5 (1991).

Third, "the overall trend towards deinstitutionalizing people with developmental disabilities has led to a rise in the number who live on the streets or in shelters." Petersilia, <u>supra</u>, at 11. Scholars have warned that "deinstitutionalization in many states simply moved people from the back wards to the back alleys [and the] promise of freedom has often proved to be as chimerical as the promise of

treatment." Martha Minow, Law and Social Change, 62 UMKC L. Rev. 171, 180 (1993) (internal quotation marks omitted); see also id. (commenting that, while "the link between homelessness and deinstitutionalization has been exaggerated in the press and in public imaginations[,] ... [i]t is difficult ... to challenge the widespread public perception that reformers have granted people with mental disabilities a right to live on the sidewalk."). People with intellectual disabilities who do not receive the proper treatment while homeless or in shelters may "flounder and eventually come to the attention of the police and the courts." Petersilia, supra, at 11.

Last, although individuals with intellectual disabilities tend to have the same or lower rates of substance abuse as others, see Karen M. Cocco and Dennis C. Harper, Substance Use in People with Mental Retardation: A Missing Link in Understanding Community Outcomes?, 46 Rehabilitation Counseling Bulletin 34, 35-37 (2002), "little is known ... about how to best

address alcohol or drug addiction among people with [mental retardation] with or without cooccurring [mental illness]," Elspeth Slayter and Shelley A. Steenrod, _Addressing Alcohol and Drug Addiction Among People with Mental Retardation in Nonaddiction settings: A Need for Cross-System Collaboration_, 9 J. of Soc. Work Practice in the Addictions 71, 72 (2009). This lack of specialized drug treatment for those with intellectual disabilities potentially leads to repeated violations of supervised release or probation.  _Cf_. Frank J. Laski, _Sentencing the Offender with Mental Retardation in The Criminal Justice System and Mental Retardation_ 137, 138 (Ronald W. Corley et al., eds., 1992) ("Characteristics associated with the disability of mental retardation frequently result in the defendants being viewed as poor risks for probation and other diversionary noninstitutional programs.").

As increased numbers of defendants with intellectual disabilities do come before the court, one issue is how to account for such a disability in

sentencing.   Although a goal of deinstitutionalization is 'normalization'--that is, for people with disabilities to live in and interact with the community--the emerging consensus is that courts must still take into account a defendant's intellectual disability upon sentencing.   <u>See</u> Courselle et al., <u>supra</u>, at 4; Petersilia, <u>supra</u>, at 9 ("The consensus within the profession, and endorsed by The Arc of the U.S., the President's Committee on Mental Retardation, and the American Association on Mental Retardation, is that because of the unique aspects of the law enforcement and correctional environments, the normalization goals for people who are mentally retarded should <u>not</u> fully apply to those settings.") (emphasis in original).   That does not mean that people with intellectual disabilities should not face consequences for their crimes, but instead that courts should consider intellectual disability when addressing culpability for a crime and appropriate punishment. The Sentencing Guidelines recognize this need through

the downward departure for diminished capacity. See USSG § 5K2.13. Courts have recognized this need as well, granting downward variances pursuant to 18 U.S.C. § 3553(a) based on intellectual disability. See United States v. Piggott, 2015 WL 1894319, at *4 (M.D. Ala. 2015) (Thompson, J.) (varying downward where defendant had IQ in the mid-70s because the defendant was "in many ways like a child in his ability to grasp the consequences of his actions"); see also United States v. Blair, 565 F. App'x 548, 557 (7th Cir. 2013) (affirming lower-court opinion granting downward variance based on the defendant's decreased culpability due to his intellectual disability); United States v. Allen, 250 F. Supp. 2d 317, 321 (S.D.N.Y. 2003) (Scheindlin, J.) (varying downward based, in part, on the defendant's low-average to borderline IQ scores). In sum, if twin objectives of sentencing are punishment for culpable behavior and (re)habilitation, those two objectives should be tailored to a person with

25

intellectual disabilities who is likely less culpable and needs specialized treatment.

With this background in mind, the court turns to why it did not revoke Johnson probation and instead modified the conditions.

### B.

Even if Johnson did not have intellectual disabilities, the question of whether to sentence him to a custodial sentence would have been difficult. For his original crime, he was pulled into a family tax-fraud scheme the year he dropped out of school; moreover, he played a minor role. During probation, he--like any person addicted to drugs--has gone through clean periods and relapses. While he has been given two chances at an inpatient facility, he never entered the first one because he tested positive on the first day, and he completed all but ten days of a six-month term at the second facility. At the second facility, he did not use any illegal substance for six months,

and he was kicked out, not because of a positive drug test, but rather because he smoked a cigarette. Although sending him to prison for three months could be a wake-up call, it is unclear whether a wake-up call helps solve the underlying addiction. And, from this court's experience, drug-treatment programs in prison have decidedly mixed results. It is also questionable in general whether a non-violent felon, who committed one crime when he was 18, should be put in prison more than five years later for drug addiction.

Johnson's intellectual disability made it an easier case. Johnson received little special education at school, and, soon after he aged out, his family pulled him into a crime. As noted above, his intellectual disability likely made him more susceptible to these negative influences. On probation, he has made good-faith efforts to maintain employment and currently has a part-time job. His problem has been illegal drugs, and he has shown the ability to refrain from using them for long periods, including the almost six

27

months that he resided in the inpatient facility. However, these periods of sobriety have been followed by relapses, perhaps because the drug treatment has not been tailored to his disability.

Given these circumstances, the court determined that specialized treatment is more reasonable punishment than custody. Specifically, as the following order lays out, the court will require drug counseling, adult-education classes, and vocational rehabilitation. The drug counseling both will reinforce the need to avoid spice and will give Johnson someone to talk to, a desire that he emphasized at sentencing. The adult-education classes and vocational rehabilitation will help Johnson with reading, writing, arithmetic, and communication skills that will help him in his daily interactions and his work. Combined, these treatments, the court hopes, will help Johnson to be part of the community.

***

28

Having found defendant Courtney Johnson guilty of violating his probation by failing to reside at a residential reentry center for six months, it is ORDERED that the petition for revocation (doc. no. 368) is granted only to the extent that defendant Courtney Johnson's conditions of supervision are modified as follows:

(1) Defendant Johnson, because he has admitted to use of "Spice", shall attend and successfully complete an outpatient treatment program at Chemical Addictions Program (CAPS).

(2) Defendant Johnson, when he is not employed, shall attend a vocational rehabilitation course as determined by the supervising probation officer.  The probation officer should look for a course that focuses on development of employment and communicative skills.

(3) Defendant Johnson is required to attend adult-education classes to help with his reading, writing, and arithmetic.

(4) Defendant Johnson shall receive mental-health treatment.   Defendant Johnson, at the revocation hearing, suggested that, when he was medicated, he felt better.   Whoever is responsible for providing defendant Johnson with treatment should assess whether medication is necessary.   If so, defendant Johnson shall take his medication as prescribed.

(5)  It is recommended that defendant Johnson work toward obtaining his GED.   At the revocation hearing, defendant Johnson said that this was a personal life-long goal, and, with this recommendation, the court wishes him best in working toward this goal.

It is further ORDERED that defendant Johnson's probation is not revoked.

DONE, this the 17th day of August, 2015.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE